IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | No. 2:16-cr-00868-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| GONSALO ESTEBAN COLINA RODRIGUEZ, | ) ) | |
| | ) | |
| Defendant. | ) ) | |

This matter is before the court on a motion to suppress filed by Gonzalo Esteban Colina Rodriguez ("Rodriguez"). Based on the parties' filings and the evidence produced at the hearing on this matter, the court denies the motion to suppress.

## I. BACKGROUND

On June 17, 2017, at about 12:37 A.M., Lance Corporal K.L. Bird ("Bird") of the South Carolina Highway Patrol ("SCHP") stopped a maroon BMW hatchback with Florida plates for improper lane violations as it headed south on Interstate 95. The government claims that, due to the lane violations and the time of night, Bird was concerned that the driver might be impaired by intoxication and/or lack of sleep. For several minutes at the beginning of the stop, Bird engaged in casual conversation with Rodriguez, which the government argues was part of his investigation into whether Rodriguez was impaired. During this conversation, Bird learned that Rodriguez was from Cuba, spoke some English, and was travelling with his brother who was sitting in the passenger seat. After several minutes of conversation, Bird went back to his patrol vehicle to transmit Rodriguez's information to the El Paso Intelligence Center ("EPIC"), a database containing information from different law enforcement agencies. It took about

1

20 minutes for Bird to give the pertinent information to EPIC and to receive the results. After finishing his search of the EPIC database, Bird got out of his car and returned to Rodriguez to briefly ask further questions about his trip, the items in his vehicle, and whether he had any illegal contraband. Bird then returned Rodriguez's personal documents to him and explained the warning that Rodriguez was receiving for the traffic violation. During this conversation, Bird had the written warning in his hand extended to Rodriguez, although Rodriguez did not take the warning. Bird then asked Rodriguez if he could search the vehicle. Rodriguez paused and then replied "Ok" and "Yeah." For the next ten minutes, Bird and another trooper who had arrived on the scene searched the vehicle and found about $134,500 in U.S. currency hidden under the backseat in heat-sealed plastic bags. The other officer then read Rodriguez and his brother Miranda warnings and placed them under arrest.

Rodriguez was indicted on one count of aiding and abetting bulk cash smuggling into the United States, in violation of 31 U.S.C. § 5332 and 18 U.S.C. § 2. On December 21, 2017, Rodriguez filed a motion to suppress this evidence, claiming that he was unreasonably detained and that he did not validly consent to the search. On March 23, 2018, the government filed a response. The court held a hearing on June 20, 2018. The government and defense filed post-hearing supplemental briefs. The motion is now ripe for the court's review.

## II.  DISCUSSION

Rodriguez challenges the seizure of the evidence found in his car based on two grounds: (1) the traffic stop became an illegal detention when Bird impermissibly extended the stop; and (2) the search was not consensual.

### A. Was the stop impermissibly extended?

The Fourth Amendment guarantees the right of the people "to be secure in their persons, houses, papers, and effects." U.S. Const. amend. IV. A traffic stop is a "seizure" within the meaning of the Fourth Amendment and must be reasonable under the circumstances. See Delaware v. Prouse, 440 U.S. 648, 653–54 (1979). A warrantless search is "per se unreasonable" unless one of the specifically established exceptions, like consent, is present. Schneckloth v. Bustamonte, 412 U.S. 218, 219, (1973). The constitutionality of a traffic stop is assessed under the two-prong standard in Terry v. Ohio, 392 U.S. 1 (1968). First, the articulated basis for the traffic stop must be legitimate. See United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992). Second, the officers' actions during the traffic stop must be "reasonably related in scope" to the basis for the seizure. Id.

This first prong is satisfied "whenever it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." Arizona v. Johnson, 555 U.S. 323, 327 (2009). A "vehicular violation" includes a failure to comply with traffic laws. Id. In Whren v. United States, 517 U.S. 806, 809–810 (1996), the Supreme Court held that a traffic stop did not violate the plaintiff's Fourth Amendment rights where the officer had probable cause to believe several vehicle code violations had been committed. The Whren court stated that "[a]s a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." Id.

Rodriguez does not question the validity of the initial stop. Bird testified that he initially stopped the vehicle because he observed it quickly change lanes and "extend[] on

3

over into the emergency lane, crossing the white line to the right." Tr. 52:5–10. Bird testified that swerving over the solid white line on a highway constitutes a traffic violation. Id. Thus, the traffic stop met the requirements of the first prong of Terry.

The second prong of the Terry test asks if the officer took impermissible actions after initiating the traffic stop. "If a police officer wants to detain a driver beyond the scope of a routine traffic stop, [ ] he must possess a justification for doing so other than the initial traffic violation . . . [and] a prolonged automobile stop requires either the driver's consent or a reasonable suspicion that illegal activity is afoot." United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008). "Authority for the seizure . . . ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." Rodriguez v. United States, 135 S. Ct. 1609, 1614 (2015). A stop exceeds "the permissible duration and scope of a routine traffic stop" when the officer "fail[s] to diligently pursue the purposes of the stop and embark[s] on a sustained course of investigation into the presence of [contraband] in the car that constitute[s] the bulk of the encounter between the officer and the defendant." United States v. Guijon-Ortiz, 660 F.3d 757, 759 (4th Cir. 2011) (internal quotation marks omitted). A de minimis delay does not violate the Fourth Amendment; rather "the principal inquiry . . . is the officer's diligence—i.e., his persevering or devoted application to accomplish the undertaking of ascertaining whether the suspected traffic violation occurred, and, if necessary, issuing a ticket." Id. (internal quotation marks omitted).

Officers may conduct certain safety-related checks such as requesting a driver's license and vehicle registration, checking for criminal records, and outstanding arrest warrants, "so long as" these unrelated inquires did not "measurably extend the duration of

4

the stop." Rodriguez, 135 S. Ct. at 615. "[A]n officer reasonably may search a computer database during a traffic stop to determine an individual's prior contact with local law enforcement, just as an officer may engage in the indisputably proper action of searching computer databases for an individual's outstanding warrants." United States v. Hill, 852 F.3d 377, 379 (4th Cir. 2017). Further, an officer's decision to search databases beyond those of the Department of Motor Vehicles ("DMV") and the National Crime Information Center ("NCIC") does not violate a defendant's Fourth Amendment rights. Id.

Having reviewed the dashcam footage from Bird's police vehicle, which began recording the moment that Bird turned on his blue lights, the court finds that his actions meet the requirements of the second prong of Terry. From the moment the dashcam video began recording until minute 2 of the dashcam video, Bird was pulling over Rodriguez and notifying South Carolina Highway Patrol dispatch of the stop. Tr. 56:18–57:17. At 2:15, Bird approached the passenger side of the vehicle. From 2:30–3:50, Bird requested and received Rodriguez's license and registration and asked Rodriguez several times to step out of the vehicle. From 4:00–8:30, Bird conversed with Rodriguez and his brother about where they were coming from and where they were going. At the hearing, Bird explained that—because of the late hour and the fact that he observed the car quickly change lanes and swerve over the white fog line—he was concerned that the driver might be impaired, either due to intoxication or lack of sleep. Tr. 64:12–18, 65:1–3, 69:14–18, 70:15–19, 70:7–19. Bird chose to spend several minutes making conversation with Rodriguez to determine whether he was impaired and whether he would be a danger to himself and others if he was allowed back on the road. Id. Bird also chose to have Rodriguez step out of the vehicle and have this conversation behind

5

the car because it was safer for them both, it would be easier for Bird to determine any impairment, and it would be easier for the dashcam video to record the interaction. Tr. 64:9–20. The nature and relatively short length of the conversation appears to the court to support Bird's explanation of his reasons for extending the stop for about four minutes in order to confirm whether Rodriguez was impaired. The court finds that Bird's conversations with Rodriguez and his brother did not impermissibly extend the stop.

At minute 8:30 of the dashcam video, Bird returned to his vehicle and can be heard texting someone and waiting for his computer system to upload. From about minute 10 until about minute 30, Bird was in communication with EPIC. EPIC is a "command center [ ] that encompasses analysts and members of Homeland Security Investigations, DEA, FBI, Border Patrol, Customs and Border Protection, and Secret Service." Tr. 6:12–21. EPIC makes its database available to all federal agencies and to state and local law enforcement agencies that have been vetted and approved by EPIC. Id. Until minute 20:06, Bird was communicating with EPIC about Rodriguez, after which Bird provided information about the passenger and the vehicle to EPIC. Tr. 91:10–17.

Hill established that officers may search databases during a stop to determine whether the driver has a criminal history. For some reason, Bird spent twenty minutes running the information through EPIC, which appears to go slightly beyond the time frame countenanced by Hill for an officer to spend searching a database. While a twenty-minute extension to search a database would normally cause the court concern, a review of the dashcam recording here demonstrates that the bulk of those twenty minutes consisted of (1) Bird signing into his computer and transmitting the information about the

car and its passengers to EPIC over the phone, and (2) Bird waiting for EPIC to return the results of the search. The court finds that Bird diligently pursued the database search throughout those twenty minutes and did not impermissibly extend the stop.[1] This is not a situation where an officer needlessly checked several databases in order to intentionally waste time without reasonable suspicion of criminal activity until a K-9 unit arrived to provide probable cause for a search. Indeed, that is exactly the type of impermissible extension that would warrant suppression of the evidence. However, in this particular circumstance, Bird spent an appropriate amount of time checking the EPIC database, after which he immediately issued Rodriguez a warning and then asked for consent to search Rodriguez's vehicle.

   **B. Did Rodriguez validly consent to the search?**

The court must next consider whether Rodriguez properly consented to the search. "A suspect's consent to search provides an exception to the Fourth Amendment's warrant and probable cause requirements . . . [and] [o]nce a defendant voluntarily gives consent,

---

[1] The government also points to the following factors that made Bird suspicious of criminal activity which justified Bird's actions during the stop: white powder on the dashboard; a clear plastic bag in the glove compartment with several gold colored rocks inside; Rodriguez's nervous demeanor; boxes in the cargo area of the car; three cell phones and a Boost mobile minutes card; and a Red Bull can in the driver's side cup holder. None of these factors, other than the Red Bull can, relate to Bird's stated reason of extending the stop several minutes to talk with Rodriguez to determine if he was impaired by tiredness. Of the remaining factors, nervousness "is not a particularly good indicator of criminal activity, because most everyone is nervous when interacting with the police." United States v. Bowman, 2018 WL 1093942, at *8 (4th Cir. Mar. 1, 2018). The presence of three cell phones and a mobile minutes card in a car with two people does not appear to the court to indicate the presence of illegal activity, nor does the presence of boxes. However, the powder on the dashboard and bag with a rock-like substance inside might indicate drug activity and provide a reasonable basis for Bird to spend some extra time searching the EPIC database to determine whether Rodriguez and his brother had any prior contact with law enforcement, specifically over drug-related matters.

a search that falls within the scope of that consent is constitutionally permissible." United States v. Ortiz, 669 F.3d 439, 445 (4th Cir. 2012). Consent must be "freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." Fla. v. Royer, 460 U.S. 491, 497 (1983). The Fourth Amendment does not require that a lawfully seized defendant "be advised that he is 'free to go' before his consent to search will be recognized as voluntary." Ohio v. Robinette, 519 U.S. 33, 35 (1996). Rather, the "test for a valid consent to search is that the consent be voluntary, and voluntariness is a question of fact to be determined from all the circumstances." Id. (internal quotation marks omitted).

Rodriguez argues that his consent was not valid because he does not speak English. Courts have found that defendants who only speak partial English, or who have trouble speaking and understanding English fluently, are still able to give consent to have their vehicles searched. See, e.g., United States v. Zubia-Melendez, 263 F.3d 1155, 1162 (10th Cir. 2001) (acknowledging that the defendant, who testified at the suppression hearing with the assistance of an interpreter, had trouble speaking and understanding English, but finding that the defendant and the officer "could converse sufficiently to understand one another"), United States v. Carrate, 122 F.3d 666, 670 (8th Cir. 1997) ("Despite [the defendant's] supposed limited ability to speak English, he understood and appropriately answered all of the troopers' questions . . . ."), United States v. Sanchez-Valderuten, 11 F.3d 985, 990–91 (10th Cir. 1993) (finding that although "the video tape indicates defendant had difficulty speaking English . . . [h]e did appear to have fair receptive English language skills,[ ] for instance, when [the officer] asked for his registration and license he produced them immediately [and] he responded to questions

concerning his travel plans by mentioning U.S. cities . . . ."), United States v. Alcarez-Mora, 246 F. Supp. 2d 1146, 1149–52 (D. Kan. 2003) (declining to suppress evidence due to defendant's alleged failure to speak and understand English because "defendant did respond to an English statement at least once without the benefit of any interpretation, and did speak in and English another time").

Rodriguez claims to have limited proficiency in English and chose to testify at the suppression hearing with the assistance of a Spanish interpreter. However, the dashcam video reveals that Rodriguez was able to conduct several conversations with Bird and follow simple instructions throughout the traffic stop, even if Bird had to repeat himself. For instance, when Bird instructed him to "get out of the car," Rodriguez replied "get out of the car?" before exiting the car. Tr. 67:9–11. Bird then asked "you don't speak English?" to which Rodriguez replied "a little." Tr. 68:14–15. Bird and Rodriguez then had a conversion in which Rodriguez conveyed that he is from Cuba, and that although he has a commercial driver's license, he has not been driving as a commercial driver for a while because of problems with his back, a notion he repeated several times throughout the stop. Tr. 68:6–24. Bird asked Rodriguez if he was sleepy or tired, to which Rodriguez answered "no." Tr. 70:7–8. Bird then questioned him about how long Rodriguez has been on the road, where Rodriguez was coming from, and where he was going; Rodriguez responded that he was coming from New Jersey, where he had been for three days visiting a friend. Tr. 70:9–25, 74:10–18. When Bird informed Rodriguez that he would be issuing him a warning, Rodriguez responded by asking "no ticket?", indicating that he understood Bird's prior explanation of the difference between a ticket and a warning. Tr. 108:18–23. It was immediately after this that Bird asked Rodriguez

"[c]an I search your vehicle?" Tr. 108:24–25. After Bird repeated his question several times, Rodriguez agreed, and Bird proceeded to search the vehicle along with another officer who had recently arrived on the scene.

At the hearing on this matter, Bird testified that, despite having to repeat himself several times during the stop, he did not feel that he had any problem communicating with Rodriguez. The court has carefully reviewed the dashcam footage of these interactions and finds that Rodriguez demonstrated a sufficient understanding of English during the stop such that the court can conclude that he understood Bird's request to search the car. Thus, the court finds that Rodriguez's consent was proper and that the search was permissible.

### III. CONCLUSION

For the reasons set forth above, the court denies the motion to suppress.

**AND IT IS SO ORDERED**.

---
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**October 19, 2018**
**Charleston, South Carolina**